[No. H020625. Sixth Dist. July 31, 2001.]

SHIRLEY WERSHBA, Plaintiff and Respondent, v.
APPLE COMPUTER, INC., Defendant and Respondent.

CONSUMER ADVOCATES et al., Plaintiffs and Respondents, v.
APPLE COMPUTER, INC., Defendant and Respondent;
FRANCIS X. DOHERTY et al., Objectors and Appellants.

## COUNSEL

Thornton, Taylor, Downs, Becker, Tolson & Doherty, J. Edward Kerley and Marysia S. Okreglak for Objector and Appellant Francis X. Doherty.

Dykema & Gosssett and Andrew J. McGuinness for Objector and Appellant James S. Rudolph.

Anderson & Anderson, Martin W. Anderson, Fred W. Anderson; Alexander, Hawes & Audet, William M. Audet; Berman, Devalerio, Pease & Tabacco and Joseph J. Tabacco, Jr., for Plaintiffs and Respondents Shirley Wershba and Consumer Advocates.

Morrison & Foerster, Penelope A. Preovolos, Dean J. Zipser and Carole E. Reagan for Defendant and Respondent.

## OPINION

**BAMATTRE-MANOUKIAN, J.**—In these consolidated class actions against Apple Computer, Inc. (Apple), the court entered judgment certifying a nationwide class and approving a class settlement. Francis X. Doherty and James S. Rudolph, who objected to the class settlement in the trial court, appeal. They argue that the settlement was not fair and reasonable, that the trial court applied improper criteria in certifying the nationwide class and failed to protect the rights of absent class members, and that notice was legally inadequate. In addition, appellant Doherty argues that the award of attorney fees and expenses was improper and was not supported by the evidence. We reject these claims and affirm the judgment.

### BACKGROUND

In the fall of 1997, Apple was experiencing financial difficulties. As part of its effort to cut costs, Apple decided to restructure its technical support policies. On October 13, 1997, Apple issued a press release announcing that it would discontinue its prior practice of providing free telephone technical support to purchasers of certain Apple products. The free support "for as long as you own your Apple product" had been promised in brochures advertising and accompanying the products. Technical support would henceforth be available through other means, including a telephonic voice response system and Internet-based support. Customers who wished to continue to obtain live telephone technical support could do so for a fee of $35 per incident, or could purchase a multi-incident support contract for $69. The change in policy was to be "effective immediately."

By letter dated November 7, 1997, the Federal Trade Commission (FTC) notified Apple that it was initiating an investigation into Apple's change of policy regarding technical support.

On November 24, 1997, the first of three class action lawsuits against Apple was filed in Orange County. (*Consumer Advocates and Prado v. Apple Computer, Inc.* (Super. Ct. Orange County, 1997, No. 787214), hereafter referred to as the *Prado* action.) The complaint alleged that the class consisted of Apple customers who had purchased a covered product and were affected by the withdrawal of free technical support. The complaint alleged further that Apple's change in its technical support policy breached its contracts with its customers and violated the California Business and Professions Code (Bus. & Prof. Code, § 17200 et seq.) and the California Consumers Legal Remedies Act. (Civ. Code, § 1750 et seq.) The complaint sought injunctive relief, restitution, damages, punitive damages, and attorney fees. Discovery commenced in the *Prado* action and continued during 1998.

During the spring and summer of 1998, Apple negotiated separately with the FTC and with the *Prado* plaintiffs in an attempt to reach settlements. The parties in the *Prado* action eventually agreed to a mediation before retired Orange County Superior Court Presiding Judge Leonard Goldstein, which commenced in the early fall of 1998. Meanwhile, two other class actions were filed, both in Santa Clara County Superior Court. On July 27, 1998, *Wershba v. Apple Computer, Inc.* (Super. Ct. Santa Clara County, 1998, No. CV775618) was filed. A third class action lawsuit was filed on September 2, 1998 (*Dobos v. Apple Computer, Inc.*) and was later dismissed without prejudice. The allegations of the complaints in these three actions were virtually identical.

At the time of the mediation in the *Prado* action, counsel for the *Prado* plaintiffs was advised of the other two class actions and also learned of the FTC investigation. Plaintiffs' counsel in the *Prado* contacted the FTC in an attempt to coordinate settlement negotiations, but the FTC would not confirm or deny that it was conducting an investigation. On September 29, 1998, Tony Prado filed a motion for class certification in the Orange County Superior Court. Because settlement negotiations were ongoing, the hearing on the motion for class certification was continued several times.

The parties in the *Prado* action participated in three mediation sessions with retired Judge Goldstein in September and October of 1998. Prado obtained further discovery during mediation as to the size of the class, the amount of money Apple had received from customers paying for telephone support under the new policy, and the cost of reinstating free telephone

technical support. By all accounts, the negotiations were hard fought and the settlement terms were vigorously contested.

By October 18, 1998, Apple had agreed to settle the *Prado* class action. The basic components of the settlement were: (1) Apple would resume free live telephone technical support; (2) Apple would refund to class members all monies paid to Apple for technical support during the time free support was unavailable; (3) Apple would reimburse up to $35 to class members who had paid third parties for technical support; and (4) Apple would provide $50 coupons to class members who were denied technical support but did not incur any expenses in obtaining technical support elsewhere. The parties then engaged in discussion with counsel for plaintiffs in the other two filed class actions in order to consolidate the actions and negotiate a global settlement. The *Prado* action was transferred to Santa Clara County Superior Court and all of the cases were consolidated for purposes of the settlement approval process. The parties arrived at an agreement in principle on a global settlement on December 2, 1998.

On January 26, 1999, the FTC announced that it had reached a proposed settlement agreement with Apple as a result of its investigation. Under this proposed settlement Apple agreed to reinstate its free live technical support and to refund to its customers fees paid for technical support after the free technical support policy was discontinued in October of 1997. The settlement agreement containing a consent order was finally approved and entered on July 29, 1999.

Meanwhile, once the class actions were consolidated and the key terms of the settlement had been agreed on, the parties attempted to negotiate the issue of plaintiffs' attorney fees. Once again the matter was submitted to mediation, this time before retired Judge Daniel Weinstein of the San Francisco Superior Court. Mediation concluded on February 10, 1999, with a "last offer" arbitration based upon briefing and argument by the parties. Class counsel sought an award of $1,075,000. Apple submitted the figure of $875,000. The mediator chose Apple's figure and recommended awarding class counsel fees and expenses of $875,000.

On March 26, 1999, the Santa Clara County Superior Court issued an order granting preliminary approval to the proposed class settlement, granting conditional certification of the nationwide settlement class, and approving the forms and methods of class notice. The court set a final hearing for August 20, 1999, to consider and determine whether the requirements for certification of the class were met, whether the proposed settlement should be approved, whether attorney fees should be approved, and whether final

judgment approving the settlement and dismissing the actions should be entered. Papers submitted to the court in support of these orders advised the court that "a proceeding commenced by the Federal Trade Commission" involving Apple's change in its technical support policy was "pending."

Apple mailed or e-mailed notice to approximately 2.4 million class members, including claim forms, releases and instructions, and in addition posted notice on its Internet Web site and published the class notice in USA Today and MacWorld. The notice provided that any class member who wished to be excluded from the class or who wished to object to any aspect of the proposed settlement agreement, including class certification and the payment of attorney fees, must do so by July 2, 1999. Notice further provided that claims for reimbursement for money paid to third parties and claims for coupons were to be postmarked no later than September 8, 1999. Only 363 class members chose to opt out of the settlement. Only 20 class members objected to the settlement and of those only two, the appellants in the present case, appeared at the hearing.

Francis X. Doherty filed his objections to the proposed settlement on June 28, 1999. He objected on general grounds that the settlement did not fairly compensate the class members and that the attorney fee award was inappropriate. Doherty's points and authorities in support of his objections were not filed until August 13, 1999, only a week before the hearing. He contended that the settlement was not reasonable in light of clear proof of Apple's liability and that the court had not complied with its fiduciary duties to protect the absent class members. He argued that the $50 coupons offered as part of Apple's settlement severely limited the recovery of a significant number of class members. He also argued that the attorney fee award was not justified in light of the fact that Apple's settlement with the FTC resulted in virtually the same relief to the class members. Thus, class counsel provided no tangible benefit to the class. Furthermore, Doherty objected to the "baseball" arbitration, whereby the mediator was allowed to choose a high or low figure to determine attorney fees.

Objections to the proposed settlement were also filed by James S. Rudolph.[1] Rudolph argued that the notice and proposed settlement failed to inform the class members that the proposed relief provided by the settlement had already been achieved by the FTC. Rudolph also claimed that the methods of disseminating the class notice were inadequate and that he had not personally received notice. He argued further that because the claims in this case were state law claims, the class representatives did not adequately represent the nationwide class and the class was therefore not properly

---

[1]This document is not file-stamped. We therefore cannot state when it was filed.

certifiable as a nationwide class. Finally, Rudolph argued that the proposed settlement was unfair, principally in that the $50 coupon provision did not adequately compensate a large number of class members who were unable to obtain the free technical support they were entitled to when they called Apple, but who chose not to pay to purchase support. Rudolph, a resident of Michigan, filed a separate class action suit in Michigan against Apple, alleging state law claims arising out of Michigan law.[2]

Apple and the class action plaintiffs filed extensive points and authorities and declarations in support of approval of the settlement and the attorney fees award, and in response to the objections filed by the two objectors. The hearing was held as scheduled on August 20, 1999, and the court took the matter under submission.

On September 7, 1999, the court issued its order certifying the class and approving the settlement and attorney fees award. The court found that the settlement represented a reasonable compromise in light of all of the facts and that the parallel negotiations with the FTC did not alter this analysis. The court found that notice was "extensive and well within precedent" and that the contents of the notice were legally sufficient. The court further found that certification of a nationwide class was appropriate and that the class representatives met all the necessary requirements. The court found that the class action suits were "a substantial contributing factor" to Apple's decision to restore the technical support and make refunds and that the additional benefits provided in the settlement agreement, over and above what was provided in the FTC consent agreement, were not de minimis. Thus the class attorneys provided a benefit and were entitled to reasonable attorney fees. The court disapproved of the parties' use of "baseball arbitration" but found after an independent assessment that the amount of the award was reasonable. Judgment was entered pursuant to this order on September 8, 1999.

Doherty and Rudolph have both appealed from the judgment. Plaintiffs in the consolidated class actions and defendant Apple are both respondents in this appeal.

## Issues

### Standard of Review

■ In general, questions whether a settlement was fair and reasonable, whether notice to the class was adequate, whether certification of the class

---

[2]Rudolph has represented in his opening brief on appeal that the Michigan court has stayed his state court action pending the outcome of this appeal.

was proper, and whether the attorney fee award was proper are matters addressed to the trial court's broad discretion. (*Dunk v. Ford Motor Co.* (1996) 48 Cal.App.4th 1794 [56 Cal.Rptr.2d 483] (*Dunk*).) Our review is therefore limited to a determination whether the record shows "a clear abuse of discretion." (*Id.* at p. 1802.) Our task is not to determine in the first instance whether the settlement was reasonable or whether certification was appropriate. We determine only whether the trial court acted within its discretion in making the rulings that it did. (*Id.* at p. 1807; *7-Eleven Owners for Fair Franchising v. Southland Corp.* (2000) 85 Cal.App.4th 1135, 1145 [102 Cal.Rptr.2d 777].)

Appellants contend that the trial court neglected its legally imposed fiduciary duties to the class members and failed to apply correct legal standards in other respects in approving this settlement. To the extent that it appears the trial court's decision was based on improper criteria or rests upon erroneous legal assumptions, these are questions of law warranting our independent review. (*Osborne v. Subaru of America, Inc.,* (1988) 198 Cal.App.3d 646, 654 [243 Cal.Rptr. 815]; *Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 436 [97 Cal.Rptr.2d 179, 2 P.3d 27].)

*Standing Issues*

█ At the outset, the class respondents contend that Doherty and Rudolph do not have standing to pursue this appeal, that they may not raise issues here that were not advanced in the trial court, and that they failed to comply with the California Rules of Court with respect to their briefing and their joint appendix. We turn first to these threshold issues.

Doherty timely filed his objections to the proposed settlement prior to the July 2, 1999 deadline, but did not file points and authorities in support of his arguments until August 13, 1999, just a week before the hearing. The late filing of Doherty's points and authorities was raised in the trial court and the court impliedly found that any untimeliness did not prevent Doherty from appearing and having his objections heard. The objections themselves were filed before the deadline and gave notice as to the general nature of Doherty's claims. We find no reason to disturb the court's discretion on this matter. As Doherty was allowed to present his objections below, he also has standing here. Class members who appear at a final fairness hearing and object to the proposed settlement have standing to appeal. (*Trotsky v. Los Angeles Fed. Sav. & Loan Assn.* (1975) 48 Cal.App.3d 134, 139 [121 Cal.Rptr. 637].)

Rudolph filed his objections in a timely manner but failed to file documentary proof, by way of declaration or affidavit, that he was a class

member. As Rudolph points out, however, the notice to class members did not clearly inform them that objectors must submit documentary proof of class membership at the time of the hearing. The notice indicated that only a "written statement[]" of objections was required. In any event, the attachments to Rudolph's objections, including a copy of a complaint "to be filed" by Rudolph against Apple in Michigan, a copy of a brochure Apple had provided Rudolph when he purchased his computer, and a copy of a letter from Apple to Rudolph responding to his complaints about Apple discontinuing free technical support, adequately established his standing as a class member. Furthermore, at the hearing the court questioned Rudolph's counsel as to whether Rudolph wished to opt out by filing his separate complaint in Michigan or whether he wished to proceed as a member of the class and have his objections heard. Counsel replied that he wished to be heard and the court allowed him to present his arguments. We find the record contains evidence showing that Rudolph has standing to appeal. (*Trotsky v. Los Angeles Fed. Sav. & Loan Assn., supra,* 48 Cal.App.3d at p. 139.)[3]

In a related argument, class respondents contend that appellant Doherty may not object to any of the features of the settlement agreement which he did not demonstrate would directly affect his rights. We reject this contention in the circumstances of this case. (But see *Rebney v. Wells Fargo Bank* (1990) 220 Cal.App.3d 1117, 1129-1132 [269 Cal.Rptr. 844].) Here the only requirements for class membership, as set forth in the notice to the class, were that the class member purchased the covered Apple product during the requisite period of time and was affected by the change in Apple's technical support policy. Plaintiff class representatives were exposed to the identical conduct by Apple as all other class members, including Doherty, and as we conclude herein, they could fairly represent the interests of the entire class in the settlement. At the hearing below, Doherty was allowed to object to all aspects of the settlement agreement without any requirement that he demonstrate he was personally affected by each term and with no objections by Apple or by class counsel. We see no reason why he should be precluded from raising those same arguments here.

Next the class respondents argue that Doherty waived issues that were not specifically raised at the hearing below, either in written or oral argument. We believe most of these issues are encompassed by the general objections to the settlement agreement as fair and reasonable and may be argued in this court. And we note that the trial court limited the objectors' time for presenting oral argument at the hearing. On the other hand, the fairness of

---

[3]By order dated March 24, 2000, we denied respondents' separate motion to dismiss Rudolph's appeal on grounds that he lacked standing, without prejudice to the raising of the issue in their respondents' brief.

the settlement is addressed to the trial court's discretion in the first instance. (*Dunk, supra,* 48 Cal.App.4th at p. 1802.) Therefore to. the extent that the objectors raise an entirely new theory here, which was not considered by the court below, we will not entertain such an issue for the first time on appeal. (See, *Mattco Forge, Inc. v. Arthur Young & Co.* (1997) 52 Cal.App.4th 820, 847 [60 Cal.Rptr.2d 780]; *In re Aaron B.* (1996) 46 Cal.App.4th 843, 846 [54 Cal.Rptr.2d 27].)

Finally, we briefly address the claim that appellants' record and briefs on appeal have violated various rules of form and procedure embodied in the California Rules of Court. For instance, numerous documents in the joint appendix have not been file-stamped or conformed. (Cal. Rules of Court, rule 5.1(c)(1).) Respondents also argue that appellants' briefs did not contain accurate and complete statements of fact, and did not include appropriate cites to the record. (Cal. Rules of Court, rule 15(a).) Respondents request that we dismiss the appeal because of these alleged violations. Without, of course, excusing any failure to comply with the Rules of Court, we do not believe that such a drastic sanction is warranted here. (See *Nguyen v. Proton Technology Corp.* (1999) 69 Cal.App.4th 140, 145 [81 Cal.Rptr.2d 392] [appellate court decided to reach the merits rather than striking appellant's brief and appendix for failure to comply with the rules of court].) We will therefore proceed to the merits.

*Certification of the Class*

■ Appellants make various arguments challenging the court's certification of the class. They contend that the court failed to protect the interests of the class members by not adequately analyzing class prerequisites. They argue that, because the settlement was tendered at the same time as the motion for class certification, the trial court had a fiduciary duty to the class to use heightened scrutiny regarding class prerequisites. Doherty argues that the court should have allowed the objectors to conduct discovery to explore class prerequisites and should have continued the matter for an evidentiary hearing. Rudolph argues further that the court was not adequately informed of the different rights and interests of class members who were residents of other states and that for this reason the court's finding of a commonality of interests was suspect. Because class members in other states had different rights and remedies under their state laws, it was improper to certify a nationwide class bound only by California law.

Code of Civil Procedure section 382 authorizes class action suits in California "when the question is one of a common or general interest . . . or when the parties are numerous, and it is impracticable to bring them all

before the court." (See *Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 470 [174 Cal.Rptr. 515, 629 P.2d 23] [quoting statute].) The requirements for class certification are well established: there must be questions of law or fact common to the class that are substantially similar and predominate over the questions affecting the individual members; the claims of the representatives must be typical of the claims or defenses of the class; and the class representatives must be able to fairly and adequately protect the interests of the class. (Civ. Code, § 1781; *Dunk, supra,* 48 Cal.App.4th at p. 1806; *Richmond v. Dart Industries, Inc., supra,* 29 Cal.3d at p. 470.) We believe the record supports a finding that all of these factors were present here. The class consisted of consumers who had purchased certain Apple products during certain time periods and who had been promised free technical support for the product they purchased. All class members, including the class representatives, were similarly affected by Apple's alleged breach of this promise in that they were deprived of the benefits of the technical support.

Appellants argue that the court erred in finding that the class representatives could adequately represent all of the different subgroups of the class. Some class members paid Apple for technical support; some paid for technical assistance elsewhere; some called Apple and were refused free technical support but did not pay for support; and others were simply deterred from calling by the change in policy. The record shows that both class representatives, Prado and Shirley Wershba, were class members who had sought technical support by calling Apple and who had had their requests refused.[4] Appellants claim that the interests of the various subgroups were in conflict and thus these class representatives could not fairly protect the interests of the entire class.

We disagree. The fact that the class representatives had not personally incurred all of the damages suffered by each different class member does not necessarily preclude their providing adequate representation to the class. (See *Trotsky v. Los Angeles Fed. Sav. & Loan Assn., supra,* 48 Cal.App.3d at p. 147.) Differences in individual class members' proof of damages is not fatal to class certification. (See *Lazar v. Hertz Corp.* (1983) 143 Cal.App.3d 128, 140 [191 Cal.Rptr. 849]; *Clothesrigger, Inc. v. GTE Co.* (1987) 191 Cal.App.3d 605, 617 [236 Cal.Rptr. 605].) " '[O]nly a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status.' " (*Richmond v. Dart Industries, Inc., supra,* 29 Cal.3d at p. 470.) " '[M]ost differences in situation or interest among class members . . . should not bar class suit.' " (*Id.* at p. 473; see also *7-Eleven Owners for Fair Franchising v. Southland Corp., supra,* 85 Cal.App.4th at pp. 1162-1163.) As distinguished from *Richmond,* where the vast majority of class

---

[4]Appellant Doherty was in the same position as the class representatives, having been denied free service. Appellant Rudolph had purchased service from Apple.

members perceived their interests to be "diametrically opposed" to that of the named representative, all of the class members here suffered a common alleged wrong: they were deprived of the promised free technical support. (*Richmond v. Dart Industries, Inc., supra,* 29 Cal.3d at p. 471.) There was therefore a "well-defined community of interest among the class members." (*Id.* at p. 470.)

Furthermore, the settlement specifically addressed the interests of the various subgroups. The trial court considered whether the relief offered in the settlement agreement sufficiently benefited each category of class members and found that it did. "Plaintiffs are receiving full restoration of the free telephonic technical support service allegedly promised to them, as well as full cash refunds for all amounts expended with defendant during the time defendant charged for this service. Further, those class members who went to third parties for technical support will receive some reimbursement, and those who were deterred altogether from seeking technical support (and thus incurred no technical support expenses with Apple or elsewhere) still will receive coupons toward the purchase of Apple products." Relying on *Dunk v. Ford Motor Co., supra,* 48 Cal.App.4th 1794, which set forth and discussed the prerequisites for class representation, the trial court found that "the class representatives meet all necessary requirements to serve as such." We believe the record supports this finding and we find no abuse of discretion.

Appellants argue that heightened scrutiny was required with regard to class prerequisites because the settlement was tendered at the same time as the motion for class certification. In such a case, since there has been no adversarial proceeding to adjudicate class certification, they contend the court must take a more active role in determining that class prerequisites were met and that the class representatives can adequately represent the class. Appellants argue that the court did not comply with these standards and thus failed to ensure due process safeguards for the absent class members. (Fed. Rules Civ.Proc., rule 23, 28 U.S.C. (Rule 23); *Amchem Products, Inc. v. Windsor* (1997) 521 U.S. 591 [117 S.Ct. 2231, 138 L.Ed.2d 689].) In particular Doherty contends that the court breached fiduciary duties by not allowing him to conduct discovery, and by not ordering an evidentiary hearing to inquire into the presence of class prerequisites and the fairness of the settlement negotiating process.

■ As respondents point out, appellants' arguments regarding heightened scrutiny of precertification settlements are based on an interpretation of certification requirements in Rule 23 of the federal rules of procedure. (See *Hanlon v. Chrysler Corporation* (9th Cir. 1998) 150 F.3d 1011, 1020.) As a general rule, California courts are not bound by the federal rules of procedure but may look to them and to the federal cases interpreting them for

guidance or where California precedent is lacking. (*Daar v. Yellow Cab Co.* (1967) 67 Cal.2d 695 [63 Cal.Rptr. 724, 433 P.2d 732]; *Vasquez v. Superior Ct.* (1971) 4 Cal.3d 800 [94 Cal.Rptr. 796, 484 P.2d 964]; *La Sala v. American Sav. & Loan Assn.* (1971) 5 Cal.3d 864, 872 [97 Cal.Rptr. 849, 489 P.2d 1113].) California courts have never adopted Rule 23 as "a procedural strait jacket. To the contrary, trial courts [are] urged to exercise pragmatism and flexibility in dealing with class actions." (*Cartt v. Superior Court* (1975) 50 Cal.App.3d 960, 970, fn. 16 [124 Cal.Rptr. 376]; *Southern California Edison Co. v. Superior Court* (1972) 7 Cal.3d 832, 843 [103 Cal.Rptr. 709, 500 P.2d 621].)

 California law controls in this case. While we are not bound to follow the certification requirements of Rule 23, we note that California courts have recognized that "class action settlements should be scrutinized more carefully if there has been no adversary certification." (*Dunk, supra,* 48 Cal.App.4th at p. 1803, fn. 9.) This reflects concerns that the absent class members, whose rights may not have been considered by the negotiating parties, be adequately protected against fraud and collusion. (*Id.* at pp. 1801, 1807, fn. 19; *Officers for Justice v. Civil Service Com'n, etc.* (9th Cir. 1982) 688 F.2d 615, 624.) However, these concerns are satisfied by a careful fairness review of the settlement by the trial court. Even in the federal cases cited by Doherty, pre-certification settlements are routinely approved if found to be fair and reasonable. (See *In re Baldwin-United Corp.* (S.D.N.Y. 1984) 105 F.R.D. 475, 478; *Mars Steel v. Continental Ill. Nat. Bank & Trust* (7th Cir. 1987) 834 F.2d 677, 681; *In re Beef Industry Antitrust Litigation* (5th Cir. 1979) 607 F.2d 167, 174; *Hanlon v. Chrysler Corporation, supra,* 150 F.3d at pp. 1019, 1030.) The possibility of abuse in such cases is "held in check by the requirement that the judge determine the fairness of the settlement before he can approve it." (*Mars Steel v. Continental Ill. Nat. Bank & Trust, supra,* 834 F.2d at p. 681.) As we discuss more fully below, among the factors considered by the court in evaluating fairness is whether the settlement is the result of an arm's-length negotiating process and whether class members have reacted favorably or unfavorably to the proposed settlement. In addition, in this case it is clear from the record that the court carefully considered the remedies provided by the settlement to each subclass of class members in determining fairness. We conclude that even bearing in mind the heightened need for class protection in precertification settlements, the court did not abuse its discretion here.

As to the claim that the trial court should have ordered an evidentiary hearing to inquire into the prerequisites for class certification, there is no "ironclad requirement" for such a hearing, even under the federal cases. (See *Mars Steel Corp. v. Continental Illinois Nat. Bank, supra,* 834 F.2d at

p. 684.) Appellant's reliance on Civil Code section 1781, subdivision (c), is misplaced. That statute does not speak to class action settlements and in any event does not require such a hearing in the absence of a noticed motion. There was no motion here, although appellant Doherty did include a request for discovery in his written objections, filed shortly before the hearing, in which he asked to be provided with all "communications concerning the settlement." The record further shows that Doherty had informally requested discovery from class counsel, who had offered to make the relevant documents available to him, but that Doherty had not taken advantage of this offer. Although the court may allow discovery upon an appropriate motion and showing by the objector, this again is a matter addressed to the discretion of the trial court. The court was within its discretion to deny discovery requested a week before the hearing.

Finally, Rudolph argues that the court erred in certifying a nationwide class, as California law may not be applied to the claims of nonresident class members, both under constitutional principles and under choice-of-law rules. He contends further that differences in state laws preclude a finding of a predominance of common issues. Under constitutional law, a state court must have " 'significant contact or significant aggregation of contacts' to the claims asserted by each member of the plaintiff class, contacts 'creating state interests,' in order to ensure that the choice of [forum] is not arbitrary or unfair." (*Phillips Petroleum Co. v. Shutts* (1985) 472 U.S. 797, 821-822 [105 S.Ct. 2965, 2979, 86 L.Ed.2d 628].) Under choice-of-law rules, the trial court determines whether the law of other states is materially different and whether other states have an interest in having their law applied, and if so which state's interest would be more impaired if its policy were subordinated to the law of another state. (*Clothesrigger, Inc. v. GTE Corp., supra,* 191 Cal.App.3d 605, 614 (*Clothesrigger*); *Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 919 [103 Cal.Rptr.2d 320, 15 P.3d 1071].) Rudolph argues that applying California's unfair business practice law to residents of other states does not further any legitimate interest of this state and interferes with protections available under the law of other states, which might offer greater relief. Thus California's unfair business law cannot support nationwide class certification. (See *Norwest Mortgage, Inc. v. Superior Court* (1999) 72 Cal.App.4th 214 [85 Cal.Rptr.2d 18].) We reject these arguments.

*Clothesrigger* was an action against a long-distance telephone communications company. In *Clothesrigger* the court found sufficient contacts with California to allow constitutional application of California law to the claims of a nationwide class where 1) the defendant did business in California, 2) the defendant's principal offices were located in California, 3) a significant

number of class members were located in California, and 4) the defendant's agents who prepared the promotional and advertising literature at issue in the litigation did so in California. (*Clothesrigger, supra,* 191 Cal.App.3d at p. 613.) "[T]hus the alleged fraudulent misrepresentations forming the basis of the claim of every [class member] nationwide emanated from California." (*Ibid.*)

Our facts are similar. Here Apple is a California corporation, with its principal place of business in Cupertino. The brochures promising free telephone support were prepared in and distributed from California. Business and Professions Code section 17500 expressly applies to claims by out-of-state class members deceived by representations "disseminated from" the state of California. Substantial numbers of class members are located in California. And the core decision at issue here, namely the change of policy made in October of 1997, was made at Apple's headquarters in California. As in *Clothesrigger*, we find there were significant contacts with California in this case to satisfy constitutional concerns and support certification of a nationwide class.

As to choice-of-law rules, Rudolph endeavors to show that the court erred in approving a nationwide class certification on the basis of California law because the law in other states was "materially different" from the law in California and nonresident class members could do better by litigating in their own jurisdictions. (*Washington Mutual Bank v. Superior Court, supra,* 24 Cal.4th at p. 920.) For instance, Rudolph contends that under Michigan law a failure to provide a promised benefit is a violation of the law without regard to defendant's intent. Furthermore, damages could be calculated based on Apple's wrongfully gained profits, which would mean a recovery far higher than the nominal recovery available in California. Similarly, Delaware class members would have an interest in applying Delaware law to their contract claims since Delaware law permits punitive damages for willful breach of contract.

Rudolph's comparison of the laws of different jurisdictions is not persuasive. In fact California's consumer protection laws are among the strongest in the country. ■ Like Michigan, California's unfair competition law imposes liability without the necessity of showing intent. (*State Farm Fire & Casualty Co. v. Superior Court* (1996) 45 Cal.App.4th 1093, 1102 [53 Cal.Rptr.2d 229], disapproved as to actions between business competitors in *Cal-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 184-185 [83 Cal.Rptr.2d 548, 973 P.2d 527]; see also Cal. Consumers Legal Remedies Act [Civ. Code, § 1770, subd. (a)(5)].) Similar to Michigan law, California unfair competition law (Bus. & Prof. Code,

§§ 17200 et seq. & 17500 et seq.) provides for disgorgement of a defendant's wrongful gains. (See, e.g., *Fletcher v. Security Pacific National Bank* (1979) 23 Cal.3d 442, 450-451 [153 Cal.Rptr. 28, 591 P.2d 51]; *People v. Thomas Shelton Powers, M.D., Inc.* (1992) 2 Cal.App.4th 330, 340 [3 Cal.Rptr.2d 34]; but see *Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th 116 [96 Cal.Rptr.2d 485, 999 P.2d 718].) Punitive damages are also available in this state under the California Consumers Legal Remedies Act, Civil Code section 1780, subdivision (a)(4).

 The very cases relied on by Rudolph hold that a California court may properly apply the same California statutes at issue here to non-California members of a nationwide class where the defendant is a California corporation and some or all of the challenged conduct emanates from California. (*Clothesrigger, supra,* 191 Cal.App.3d 605, 612-613; *Norwest Mortgage, Inc. v. Superior Court, supra,* 72 Cal.App.4th 214, 222.) In *Clothesrigger*, the appellate court reversed a trial court which had failed to apply choice-of-law rules and instead had found that California need not take it upon itself " 'to be the savior of the other 49 states of the union.' " (*Clothesrigger, supra,* at p. 611.) As in our case, even though transactions may have occurred outside California, the representations upon which the causes of action rested in *Clothesrigger* necessarily emanated from California. Furthermore, *Clothesrigger* explicitly held that California courts normally may apply California's pro-consumer laws to consumers from other states: "California's more favorable laws may properly apply to benefit nonresident plaintiffs when their home states have no identifiable interest in denying such persons full recovery." (*Clothesrigger, supra,* 191 Cal.App.3d at p. 616.)

In *Norwest Mortgage, Inc. v. Superior Court, supra,* 72 Cal.App.4th 214, the Court of Appeal affirmed certification of a nationwide class on behalf of residents and nonresidents of California where the defendant's conduct occurred in California; however, the court reversed certification for that portion of the class who were nonresidents and for whom the conduct occurred entirely outside California, by the defendants whose headquarters and principal place of operations were outside California. The court acknowledged that remedies under the California unfair competition law "may be invoked by out-of-state parties when they are harmed by wrongful conduct occurring in California." (*Id.* at pp. 224-225; *Diamond Multimedia Systems, Inc. v. Superior Court* (1999) 19 Cal.4th 1036, 1063-1064 [80 Cal.Rptr.2d 828, 968 P.2d 539].) In those cases where the claims arose "from conduct occurring entirely outside of California," however, certification would be inappropriate. (*Norwest Mortgage, Inc. v. Superior Court, supra,* 72 Cal.App.4th at p. 227.)

Even though there may be differences in consumer protection laws from state to state, this is not necessarily fatal to a finding that there is a predominance of common issues among a nationwide class. As the Ninth Circuit Court of Appeals has observed, state consumer protection laws are relatively homogeneous: "the idiosyncratic differences between state consumer protection laws are not sufficiently substantive to predominate over the shared claims" and do not preclude certification of a nationwide settlement class. (*Hanlon v. Chrysler Corporation, supra,* 150 F.3d at pp. 1022-1023.) The *Dunk* case, relied on by the trial court, supports the certification of a nationwide class here. In that case, the Court of Appeal upheld approval of a nationwide settlement class even though the defendant was not a California corporation. In doing so, the court rejected arguments similar to those made by appellant Rudolph. In addition, the court noted that "because the case was settling, protracted determinations of other states' laws were unnecessary." (*Dunk, supra,* 48 Cal.App.4th at p. 1806.)

■■■ The recent California Supreme Court case of *Washington Mutual Bank v. Superior Court, supra,* 24 Cal.4th 906 does not compel any different result here. That case involved allegations against a bank based on mortgage instruments that contained a choice-of-law clause providing that federal law and the law of the state where the property was located would apply. The trial court ordered certification of a nationwide class without deciding what law applied to the claims of the class members. The Court of Appeal denied the bank's petition for a writ of mandate and the Supreme Court reversed. The court found that the trial court erred in granting certification without determining the effect of the choice-of-law agreements. Where there is an enforceable choice-of-law agreement, the burden is on the party seeking nationwide class certification to identify variations in applicable state law and to demonstrate how a trial on the class causes of action could be conducted fairly and efficiently in light of those variations. In our case, there was no written choice-of-law agreement. In such a case, the analysis described above in *Clothesrigger* applies. (*Clothesrigger, supra,* 191 Cal.App.3d at p. 614.) So long as the requisite significant contacts with California are shown to exist, sufficient to meet constitutional standards, the burden is on the parties challenging the nationwide certification to demonstrate that "foreign law, rather than California law, should apply to class claims." (*Washington Mutual Bank v. Superior Court, supra,* 24 Cal.4th at p. 921.) As we have discussed, that burden was not met here.

In sum, we find that the court acted within its discretion in approving certification of a nationwide class in the circumstances of this case.

*Approval of the Settlement*

■■■ In determining whether a class settlement is fair, adequate and reasonable, the trial court should consider relevant factors, such as "the

strength of plaintiffs' case, the risk, expense, complexity and likely duration of further litigation, the risk of maintaining class action status through trial, the amount offered in settlement, the extent of discovery completed and the stage of the proceedings, the experience and views of counsel, the presence of a governmental participant, and the reaction of the class members to the proposed settlement." (*Dunk, supra,* 48 Cal.App.4th at p. 1801; *Officers for Justice v. Civil Service Com'n, etc., supra,* 688 F.2d at p. 624.) The list of factors is not exclusive and the court is free to engage in a balancing and weighing of factors depending on the circumstances of each case. (*Dunk, supra,* 48 Cal.App.4th at p. 1801.) Consistent with our standard of review on appeal, we do not reweigh these factors or substitute our notions of fairness for those of the trial court. (*Ibid.*)

Although the court gives regard to what is otherwise a private consensual agreement between the parties, the court must also evaluate the proposed settlement agreement with the purpose of protecting the rights of the absent class members who will be bound by the settlement. (*Dunk, supra,* 48 Cal.App.4th at p. 1801.) The court must therefore scrutinize the proposed settlement agreement to the extent necessary to " 'reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned.' " (*Ibid.,* quoting *Officers for Justice v. Civil Service Com'n, etc., supra,* 688 F.2d at p. 625.)

The burden is on the proponent of the settlement to show that it is fair and reasonable. However "a presumption of fairness exists where: (1) the settlement is reached through arm's-length bargaining; (2) investigation and discovery are sufficient to allow counsel and the court to act intelligently; (3) counsel is experienced in similar litigation; and (4) the percentage of objectors is small." (*Dunk, supra,* 48 Cal.App.4th at p. 1802.) The record reflects all of these elements were present here. The settlement was the product of extensive and hard-fought adversarial negotiations between the parties. Two well-respected retired judges served as neutral mediators during critical stages of the negotiations. The parties engaged in discovery for a number of months both before and during the settlement negotiations. Plaintiffs served numerous interrogatories, document demands, and requests for admissions, producing several thousand pages of documents. Plaintiffs obtained sufficient discovery to prepare and file a motion to certify the class. Discovery continued during and even following the mediation sessions. Declarations submitted to the trial court demonstrated that plaintiffs' counsel were experienced in handling class action litigation. And settlement class members strongly favored the settlement. Out of over 2.4 million settlement notices sent to class members, only 20 class members objected to the

settlement and, as the trial court observed, "a number of objectors felt the settlement gave too much to the class and was unfair *to the defendant!*" (Italics in original.)

Appellants argue that Apple's liability was clear and that there were millions of potential class members with significant damages. In light of this and the fact that Apple's consent agreement with the FTC had already achieved the two main components of the settlement, appellants contend that the settlement sold the class members short and that they could have recovered more had they gone to trial. They argue in particular that the settlement did not adequately compensate large numbers of class members who were deprived of the promised benefit of free technical support, but who did not expend any money to obtain support. As to those who submitted a claim stating that they had called Apple for technical service and were denied such service, the settlement provided that Apple would issue each customer a $50 coupon, redeemable at Apple's online store if applied to a purchase over $99. The coupons were transferable but could not be aggregated. As to the substantial number of class members who were simply deterred from calling, appellants argue that those class members received nothing from the settlement.

■ First, we emphasize that "the merits of the underlying class claims are not a basis for upsetting the settlement of a class action." (*7-Eleven Owners for Fair Franchising v. Southland Corp., supra,* 85 Cal.App.4th at p. 1150; *City of Detroit v. Grinnell Corp.* (2d Cir. 1974) 495 F.2d 448, 456.) The proposed settlement is not to be judged against a hypothetical or speculative measure of what might have been achieved had plaintiffs prevailed at trial. (*Linney v. Cellular Alaska Partnership* (9th Cir. 1998) 151 F.3d 1234, 1242.) ■ Moreover, we do not believe that the likelihood of class members recovering significant amounts of damages at trial was as clear as appellants argue, particularly for the subgroups that appellants claim are not adequately compensated by the settlement. Proving "aggravation" damages for class members who were simply deterred from calling Apple would have been a speculative proposition. As to those who called and were refused service, the record shows that the coupon program was a negotiated aspect of the settlement in an attempt to provide *some* measure of damages to those class members, and that it did in fact provide valuable compensation.

Appellants object to the coupon program, arguing that fewer than 500,000 coupons would be issued, that the program required the customer to purchase another Apple product, that the coupons had very little value to Apple, and that the coupons could not be aggregated. They contend that settlements

offering certificates in lieu of cash are disfavored. Here, the number of coupons that would be issued was reasonably based on an estimate of the number of callers who had been using the free service. As to the value of the coupons, the proponents of the settlement were not required to prove their value. (*Dunk, supra,* 48 Cal.App.4th at p. 1804.) As the trial court observed, the coupon program in this case was "much more attractive" than a similar program approved of in *Dunk.* The coupons in *Dunk* were not transferable, were applicable only to a "big ticket item," represented only a tiny percentage of the purchase price, and were the only recovery by the consumer. (*Ibid.*) In our case, the coupons were just one part of a settlement that also included cash refunds and reimbursements as well as reinstating the free service. Finally, appellants argue that the court should have waited to see how many coupons were actually claimed, suggesting that only a small percentage of coupons would be redeemed. It is generally assumed that not all of those eligible for coupons will use them. However, this is but one factor for the court to consider and did not require a continuance of the hearing. (*Ibid.*) Under all of the circumstances, the trial court found that "while there are some limitations on the coupon program which arguably provide other class members with less than full compensation for the inconveniences they may have suffered, the Court finds that the elements of the settlement represent a reasonable compromise in light of all of the facts including the expense of, and probabilities of success at, trial." No manifest abuse of discretion is shown here.

Appellants challenge various other aspects of the settlement as unfair or inadequate. They contend that the payment of up to $35 to class members who sought and paid for technical support from third parties unfairly and arbitrarily limited damages those customers might have recovered. Furthermore, this aspect of the settlement was unduly burdensome to class members, appellants argue, because the customer was required to produce an invoice, perhaps years old, to obtain remuneration. The trial court could well have found that this $35 maximum amount was a reasonable figure in that it represented the amount the class member would have paid to Apple for comparable technical support. Furthermore the court could find that a customer who paid more for technical support elsewhere than he or she would have paid at Apple failed to mitigate damages. Similarly, the court could decide that the requirement of submitting some documentation to show that technical support was purchased was not unreasonable. All the customer had to show was that he or she paid for technical support during the period that Apple was not providing support, i.e., from October 17, 1997, to March 1, 1999.

The record does not bear out appellants' claim that the settlement was negotiated "from a position of weakness and inferior bargaining power" or

that it was not the product of an arm's-length negotiation. This claim is based on the assertion that at the time of the mediation sessions Apple had already consented to most of the relief sought, by virtue of its settlement with the FTC. This misstates the record, however, which shows that the principal terms of the class settlement were negotiated several months prior to the FTC announcement regarding a proposed consent decree. The trial court specifically rejected Doherty's argument that the FTC consent agreement preceded the class settlement. The court told counsel: "Is it your assertion that a final agreement with the FTC was arrived at before the settlement of this class action was arrived at with the help of mediators? Because I don't see evidence of that."

Doherty argues further that class counsel was negotiating from a position of weakness because the class had not been certified prior to the settlement negotiations. Class counsel attempted to have the class certified and filed a motion for certification of the class prior to the mediation sessions. However, due to the fact that settlement negotiations were ongoing, the motion was continued. The record reflects that class counsel vigorously negotiated a comprehensive settlement agreement on behalf of class members. Furthermore, as discussed above, precertification settlements are not necessarily flawed and in fact are routinely approved if found to be fair and reasonable. (See *In re Baldwin-United Corp., supra,* 105 F.R.D. at p. 478, fn. 2 ["many courts have employed this practice in the name of judicial efficiency in order to facilitate apparently beneficial settlement proposals"]; *Hanlon v. Chrysler Corporation, supra,* 150 F.3d at pp. 1019, 1030; *Mars Steel v. Continental Ill. Nat. Bank & Trust, supra,* 834 F.2d at p. 681; *Dunk, supra,* 48 Cal.App.4th at p. 1803, fn. 9.)

Appellants' chief contentions with regard to the court's approval of the settlement agreement involve the FTC proceeding. Appellants argue that the court improperly analyzed the impact of the concurrent FTC proceeding and that the FTC consent agreement severely undercut the value of the settlement by providing for much of the same relief. The FTC consent agreement contained the two main components of the settlement agreement: it ordered that free technical support service be reinstated and that Apple pay refunds to customers who had paid Apple for support during the time that free support was not available. Appellants contend the court erred by approving a settlement that released the rights of a large number of consumers in exchange for benefits they already had obtained under the consent order.

Although the FTC consent order was finally approved shortly before the hearing in this matter, the record shows that the FTC investigation and the class action were proceeding simultaneously. The FTC investigation was a

confidential investigation and class counsel was unaware of it until the class claims were going to mediation. At that time he contacted the FTC in an attempt to coordinate efforts, but the FTC refused to divulge any details of its investigation. The principal terms of the class settlement were reached in October of 1998, following several mediation sessions, and the parties agreed in principal to a global settlement in December of 1998. The proposed settlement with the FTC was not announced until January of 1999. On these facts, the trial court was justified in rejecting appellants' assertions that Apple had already arrived at an agreement with the FTC prior to the settlement of the class action.

Furthermore, the fact that the FTC independently determined that its settlement provided adequate redress for Apple's customers casts the class action settlement in a favorable light. The class settlement included numerous benefits for class members in addition to the two elements of the FTC settlement. It provided for guaranteed telephone hold time and a means of monitoring this for the first two years of reinstated service. It provided that the court retain jurisdiction for enforcement purposes pursuant to Code of Civil Procedure section 664.6. As to the refunds to Apple customers who paid for service, the settlement agreement provided that if customers could not be located the funds would be distributed to appropriate charities. The FTC did not endeavor to provide class members with notice that service was ordered reinstated and that refunds were forthcoming. The settlement agreement, however, provided direct notice to approximately 2.4 million customers, and in addition Apple published notice in USA Today and in MacWorld, and posted notice on its Web site. Furthermore, the settlement provided compensation to two groups of customers not provided for whatsoever by the FTC consent order. Those who paid for service from third parties were compensated up to $35, and those who did not pay anything but were denied telephone assistance were eligible for a $50 savings on a new Apple product. Finally, Apple itself acknowledged that the private lawsuits and the FTC proceeding both contributed to its decision to reinstate its free service policy. Indeed, the record shows that in large part through the efforts of class counsel, free telephone service was reinstated months prior to the consent order being made final.

The court analyzed these circumstances as follows: "It would require pure speculation to attempt to divine what terms the defendant would have agreed to in the FTC action had these lawsuits not been actively pursued at the same time, and conversely what the defendant would have agreed to herein if not for the FTC action. As such, what is important for evaluating the adequacy of this settlement is the position in which class members are placed by its terms. Thus, if plaintiffs are close to being made whole (as indeed they are)

then this settlement must be deemed 'fair, reasonable, and adequate' and in the best interest of settlement class members." We find no abuse of discretion on this record and appellants have not provided any persuasive authority why the court's analysis is legally incorrect.

Appellant Doherty contends that the court's approval of the settlement agreement ignored potential class compensation for punitive and exemplary damages. He points out that under the complaint, which included causes of action for violation of the Consumers Legal Remedies Act, punitive damages were available. This claim was not raised before the trial court either in the written objections or during the hearing, and appellant cites no authority to support the assertion that the failure to include punitive damages in a class action settlement resulted in legal error or abuse of discretion. In the context of a settlement agreement, the test is not the maximum amount plaintiffs might have obtained at trial on the complaint, but rather whether the settlement is reasonable under all of the circumstances. (See *County of Suffolk v. Long Island Lighting Co.* (2d Cir. 1990) 907 F.2d 1295, 1323.)

Along similar lines, appellants argue that the settlement did not require Apple to disgorge the approximately $4.4 million per year it saved in costs by discontinuing its free live technical support program. Again, disgorgement of profits, even if available as a component of statutory remedies, is not a required element in a settlement context. Even so, the record indicates that the cost of the settlement to Apple may well approach the $4.4 million figure, considering money paid in refunds, the expense of class notice, the redemption of even a small percentage of coupons, and reimbursement to those who paid third parties for technical support.

A settlement need not obtain 100 percent of the damages sought in order to be fair and reasonable. (See *Rebney v. Wells Fargo Bank, supra,* 220 Cal.App.3d at p. 1139 [settlements found to be fair and reasonable even though monetary relief provided was "relatively paltry"]; *City of Detroit v. Grinnell Corp., supra,* 495 F.2d at p. 455 [settlement amounted to only "a fraction of the potential recovery"].) Compromise is inherent and necessary in the settlement process. Thus, even if "the relief afforded by the proposed settlement is substantially narrower than it would be if the suits were to be successfully litigated," this is no bar to a class settlement because "the public interest may indeed be served by a voluntary settlement in which each side gives ground in the interest of avoiding litigation." (*Air Line Stewards, etc., Loc. 550 v. American Airlines, Inc.* (7th Cir. 1972) 455 F.2d 101, 109.) Here plaintiffs obtained 100 percent of the injunctive relief sought and full restitution of all monies paid to Apple, plus other relief for those not entitled to restitution. Out of approximately 2.4 million class members who

were sent direct notice of the proposed settlement, there were only 20 objectors, and of these only three objected to the substantive elements of the settlement. (Cf. *7-Eleven Owners for Fair Franchising v. Southland Corp., supra,* 85 Cal.App.4th at pp. 1152-1153 [court found the response of the class members "overwhelmingly positive" where "a mere 80 of the 5,454 noticed class members elected to opt out" and nine objected].) As the trial court observed here, plaintiffs were indeed "close to being made whole." We conclude the court was within its discretion in determining that the settlement represented "a reasonable compromise in light of all the facts."

*Notice*

 Both appellants claim that the class notice was inadequate because it failed to inform the class of the FTC consent agreement. In addition, Doherty contends that combining notice of both the pendency and the settlement of the class action improperly created an inference that the court had already approved the settlement. And Rudolph claims that the notice improperly failed to inform the class members of their rights to intervene, and that publication was insufficient.

Taking this last point regarding the sufficiency of the publication first, the trial court found that the methods used to give notice to class members were "extensive and well within precedent," citing *Dunk, supra,* 48 Cal.App.4th 1794. This finding is within the court's discretion and was supported in law and by the evidence here. Where the membership of a class is large, such as in this case, and individual damages are minimal, notice by publication alone may have been adequate. (*Cooper v. American Sav. & Loan Assn.* (1976) 55 Cal.App.3d 274, 285 [127 Cal.Rptr. 579].) The standard is whether the notice has "a reasonable chance of reaching a substantial percentage of the class members." (*Cartt v. Superior Court, supra,* 50 Cal.App.3d 960, 974.) Here notice was mailed or e-mailed directly to more than 2.4 million class members and also published in USA Today and MacWorld, two publications with a total circulation of over 2.5 million subscribers. Apple also posted notice on its Internet homepage for over 30 days. Rudolph claims he did not actually receive the mailed notice. However, it is not necessary to show that each member of a nationwide class has received notice. (*Cooper v. American Sav. & Loan Assn., supra,* 55 Cal.App.3d at p. 284.) In *Dunk,* the court approved notice which included publication in USA Today, although there was evidence that a substantial number of class members may not have actually received notice. In any event Rudolph apparently received notice within sufficient time to contact an attorney, file a class action suit in Michigan and file objections in this action.

 In regard to the contents of the notice, the "notice given to the class must fairly apprise the class members of the terms of the proposed compromise and of the options open to dissenting class members." (*Trotsky v. Los*

*Angeles Fed. Sav. & Loan Assn., supra,* 48 Cal.App.3d at pp. 151-152.) The purpose of a class notice in the context of a settlement is to give class members sufficient information to decide whether they should accept the benefits offered, opt out and pursue their own remedies, or object to the settlement. (*Ibid.*) As a general rule, class notice must strike a balance between thoroughness and the need to avoid unduly complicating the content of the notice and confusing class members. Here again the trial court has broad discretion. (*7-Eleven Owners for Fair Franchising v. Southland Corp., supra,* 85 Cal.App.4th at p. 1164 [the court has "virtually complete discretion" regarding notice to class members].) ▇ The trial court in this case found that "the contents of the notice were legally sufficient." In particular the court found that notice was not rendered inadequate because class members were not given information regarding the FTC's efforts to secure similar relief by way of a consent decree.

Appellants cite *Trotsky v. Los Angeles Fed. Sav. & Loan Assn., supra,* 48 Cal.App.3d 134 (*Trotsky*), for the proposition that it was reversible error for the trial court not to require inclusion of the pending FTC proceeding in the class notice. We find *Trotsky* to be distinguishable. In *Trotsky*, the proposed settlement included the settling of certain claims which were not included in the complaint but were the subject of a separate pending class action lawsuit. The settling parties did not inform the court or the class of the existence of this separate lawsuit. The plaintiff in the separate action objected to the settlement on the ground that a judgment approving the settlement would extinguish the claims at issue in the other class action. On appeal, the court reversed a judgment which had found the settlement, including the contents of the notice, to be fair and reasonable. The court found that the related class action involving overlapping claims that would have been extinguished by the settlement should have been disclosed to the settling class and to the court. The Court of Appeal explained that this was important to the trial court because the court could have consolidated the two actions, which were both pending in the same superior court, and could have resolved them together. And it was important to the class so that they could determine which plaintiff in which action could better represent their interests and claims. (*Trotsky, supra,* at pp. 151-152.)

In our case, all pending class actions had been consolidated at the time of the settlement. The FTC proceeding was not a class action. Indeed the FTC never filed a formal action against Apple, but rather conducted a confidential investigation and settlement negotiations which culminated in a consent order. The FTC proceeding could not have been consolidated with this class action and could not have been extinguished by this settlement. Unlike *Trotsky,* the class members' rights under the FTC consent order would not be diminished by the approval of the class settlement.

Furthermore, again unlike *Trotsky*, the record in our case shows that the FTC proceeding was disclosed to the trial court in the papers accompanying the request for conditional certification of the class and preliminary approval of the settlement, which the court granted on March 26, 1999. At the time the notice of the proposed ·settlement was sent to class members and published, the FTC consent decree had been proposed but was not yet final. The proposed settlement agreement submitted to the court thus disclosed that there was pending "a proceeding commenced by the Federal Trade Commission." Appellants contend that Apple and plaintiffs concealed this proceeding from the class and from the court, in breach of their fiduciary duties. We find no evidence of concealment in this record. The trial court indicated it was aware of the FTC proceeding and indeed was "surprised" at appellants' suggestion that Apple and class counsel had misled the court and the class by concealing this information. The notice of the proposed FTC settlement was a matter of widespread public knowledge. It was noticed in an FTC press release distributed through Associated Press, by a posting on Apple's Web site, and in a number of news publications as well as television programs. The effect of the FTC proceeding on the settlement of the class action was fully discussed during the hearing on the settlement on August 20, 1999. The court expressed its view that if this information had been provided in the notice, it would have been difficult for the average consumer to evaluate the effect of the parallel FTC proceeding on the pending class settlement. Under the circumstances we find no abuse of discretion in the court's approval of the notice in this case, notwithstanding the absence of information regarding the FTC proceeding.

Rudolph contends that the notice failed to inform the class members of their right to seek to intervene in the action using counsel of their own choosing. Rather the notice presented the options of accepting the benefits of the settlement, objecting, or opting out. Intervention would be the appropriate procedure if this were a litigated class action. (See, e.g., *Rose v. City of Hayward* (1981) 126 Cal.App.3d 926, 935-936 [179 Cal.Rptr. 287].) In the context of a class settlement, objecting is the procedural equivalent of intervening. As the court in *Trotsky* explained, notice to class members must be structured to enable them to decide "whether to intervene or object, 'opt out,' or accept the settlement." (*Trotsky, supra,* 48 Cal.App.3d at p. 152.) Here the notice set forth these alternatives, albeit without using the term "intervene." It also informed the class members that if they wished to object they could do so by filing written objections and/or appearing at the hearing. It specifically informed them that they could obtain their own attorneys if they desired. Under the circumstances, we do not find that the failure to use the term "intervene" renders the notice inadequate.

Finally, as to Doherty's argument that the notice improperly implied that the settlement had already been approved, the notice clearly states that the

settlement is a "proposed settlement," and is "[s]ubject to the Court's final approval."

*Attorney Fees*

■■■ The court approved an award of $875,000 in attorney fees, court costs and litigation expenses. Doherty argues that the attorney fees award was not based on sufficient evidence and that the "baseball arbitration" method by which the amount of fees was arrived at renders the award invalid as a matter of law.

Courts recognize two methods for calculating attorney fees in civil class actions: the lodestar/multiplier method and the percentage of recovery method. (*Zucker v. Occidental Petroleum Corp.* (C.D.Cal. 1997) 968 F.Supp. 1396, 1400.) Doherty claims the award of fees in this case was not based on either method, but rather was the result of an arbitrary procedure whereby the mediator was instructed to choose between Apple's last offer and the plaintiffs' attorneys' last demand.

The trial court explained that it did not endorse the parties' use of such "baseball arbitration" to reach a fee award. The court made clear that it did not use this method for calculating attorney fees, but that it was making "an independent assessment of the appropriate amount" of a fee award and on that basis found that the fees requested were "reasonable."

The record indicates the court employed the lodestar approach. Under this approach, the lodestar is calculated by multiplying the reasonable hours expended by a reasonable hourly rate. The court may then enhance the lodestar with a multiplier, if appropriate. (*Rebney v. Wells Fargo Bank* (1991) 232 Cal.App.3d 1344, 1347 [284 Cal.Rptr. 113]; *Zucker v. Occidental Petroleum Corp., supra,* 968 F.Supp. at p. 1400.) Doherty argues that the court did not have sufficient information to calculate attorney fees under the lodestar method. He contends there were no time sheets submitted describing work done; there was no evidence establishing the rate charged as a reasonable hourly rate; and there was no evidence from which the court could make findings regarding the various factors considered in the lodestar approach.

No specific findings reflecting the court's calculations were required. (*Rebney v. Wells Fargo Bank, supra,* 232 Cal.App.3d at p. 1349.) "The record need only show that the attorney fees were awarded according to the 'lodestar' or 'touchstone' approach." (*Ibid.*) On appeal we infer all findings in favor of the prevailing parties. (*Ibid.*) Here plaintiffs' attorneys submitted declarations evidencing the reasonable hourly rate for their services and

establishing the number of hours spent working on the case. California cases have approved of similar rates. (See, e.g., *Bihun v. AT&T Information System, Inc.* (1993) 13 Cal.App.4th 976, 997 [16 Cal.Rptr.2d 787], disapproved on another point in *Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 664 [25 Cal.Rptr.2d 109, 863 P.2d 179].) California case law permits fee awards in the absence of detailed time sheets. (*Sommers v. Erb* (1992) 2 Cal.App.4th 1644, 1651 [4 Cal.Rptr.2d 52]; *Dunk, supra,* 48 Cal.App.4th at p. 1810; *Nightengale v. Hyundai Motor America* (1994) 31 Cal.App.4th 99, 103 [37 Cal.Rptr.2d 149].) An experienced trial judge is in a position to assess the value of the professional services rendered in his or her court. (*Serrano v. Priest* (1977) 20 Cal.3d 25, 49 [141 Cal.Rptr. 315, 569 P.2d 1303].) The lodestar multiplier used was 1.42. Multipliers can range from 2 to 4 or even higher. (*Coalition for L. A. County Planning etc. Interest v. Board of Supervisors* (1977) 76 Cal.App.3d 241, 251 [142 Cal.Rptr. 766]; *Arenson v. Board of Trade of City of Chicago* (N.D.Ill. 1974) 372 F.Supp. 1349.)

Plaintiffs' attorneys submitted papers supporting the attorney fee award and explaining the various factors for the court to consider under the leading case of *Serrano v. Priest, supra,* 20 Cal.3d 25, in determining the lodestar amount and multiplier. At the hearing on final approval of the settlement, the court explained it was independently evaluating the fee claim under the lodestar method. In its written order approving the fee award, the court stated: "Under all of the circumstances, having reviewed plaintiffs' evidentiary submissions and having weigh[ed] the relevant factors, *See Dunk,* 48 Cal.[App.]4th at p. 1810, the Court finds that the fees requested are reasonable." A trial judge's determination of a reasonable amount of attorney fees will not be disturbed on appeal unless the appellate court is convinced that it is clearly wrong. (*Serrano v. Priest, supra,* 20 Cal.3d at p. 49.) We find no such abuse of discretion on this record.

## DISPOSITION

The judgment certifying the class, approving the class settlement and awarding attorney fees is affirmed.

Cottle, P. J., and Wunderlich, J., concurred.

Appellants' petition for review by the Supreme Court was denied November 14, 2001.